BENJAMIN F. DUNPHREY, PLAINTIFF IN ERROR, v. FARR & BAILEY MANUFACTURING COMPANY, DEFENDANT IN ERROR.

Submitted July 8, 1912—Decided November 18, 1912.

Where a carpenter, using a small circular saw, told his employer's foreman that it "needed setting—he could do nothing with it," and the foreman said, "Well, get someone to set it for you (which he did) and we will go over all the saws on Saturday," this complaint and promise so obviously had reference to the work to be turned out by the saw, and not to an increased danger to the carpenter using it, which clearly was not contemplated by either of them, that no alteration of the assumption of risk rule resulted therefrom.

On error to the Supreme Court, Camden Circuit.

For the plaintiff in error, *William J. Kraft* and *Howard Carrow.*

For the defendant in error, *Lewis Starr.*

The opinion of the court was delivered by

WHITE, J. This is a writ of error to review the judgment of nonsuit entered by the Supreme Court in the Camden Circuit.

The plaintiff, a carpenter, sixty-two years old, in the employ of defendant, was using a tool, known as a circular saw, which was operated by steam power on a shaft located below the surface of a table, so that the top of the saw extended up about four inches through a small slit in the top of the table, and so that by laying a board upon the table and pushing it against the saw while it revolved, the board could be sawed as desired by the plaintiff then engaged in making boxes and frames for certain concrete work in the defendant's factory. The work the plaintiff was doing was such as he was accustomed to do, and the tool he was using, the circular saw, was a kind of tool which he had been well accustomed to use in his trade. At the time the accident happened, the plaintiff was sawing a board about three feet long with this circular saw and was feeding the board to the saw, pushing it from him with his right hand and holding it down on the table with his left hand, when it flew up at the end furthest from him by reason, as he says, of the far edge of the saw, where it comes up through the slit in the top of the table, binding in the cleft which the saw had made in sawing the board, and causing the board to fly up, so that the plaintiff, in an effort to hold it down and prevent its coming up in his face, brought his left hand in contact with the revolving saw, which cut off two fingers and the thumb of his left hand. The plaintiff was, and had been, using this saw frequently, as he did his other tools, and he was obviously in a better position to observe the condition of the tools with which he was working than anyone else. There were a number of other saws hanging above the table before him for him to select

from and put on the shaft in place of the saw in use should it become desirable for any reason for him to change it.

This being the situation, it is urged that the defendant became liable for this injury because of a notice given by the plaintiff to defendant's foreman that the saw was in bad condition and a promise by such foreman to have it fixed, accompanied by a direction to the plaintiff to continue using it in the meantime. The evidence to support this contention was given by the plaintiff himself, and is as follows: "Well, Mr. Tucker and I was running the saw and ripping out some strips, and I started a strip and the saw commenced to bind, and Billy, the foreman—I never heard his last name—he came in and I said, 'Billy, I can't use that saw; I think if the saw was set it would have more opening to clear the wood.' He said, 'Get somebody to set it for you, and I will have the saws fixed up Saturday afternoon.' So Mr. Tucker took the saw off and Mr. Diehl set it for me." This was on Thursday, and the accident happened on the Saturday morning following. Again, on cross-examination, the plaintiff testified that he said to the foreman, "Billy, I can do nothing with this saw, it ought to be set, so as to give more opening to clear the wood," and the foreman answered, "Well, get somebody to set it;" and again, on redirect examination:

"*Q.* When you talked to the foreman, Billy, that you spoke of, what was it you said to him, what did you complain of?

"*A.* That saw binding.

"*Q.* And was there anything said why it was binding by either of you at that time?

"*A.* At that time, I told him I thought it ought to be set, it would cut easier.

"*Q.* What did he say to that?

"*A.* He told me to get somebody to set it for me if I didn't want to do it and Frank Diehl came in and set it.

"*Q.* He set it?

"*A.* Yes."

And, finally, on recross-examination:

"*Q.* I want to know just what complaints you made to Billy, the foreman, about that saw, as to what was the matter?

"*A*. Yes, I understand. I said to Billy, that saw needs setting, and Billy said, 'All right, get somebody to set it for you if you don't want to,' and I went out of the shop and Frank Diehl came in. Frank Diehl set the saw for me, and Tucker took it and put it on.

"*Q*. Was there anything else said to Billy, the foreman, by you?

"*A*. No, only Billy said before he went out he was going to have them fixed up Saturday afternoon when there wasn't very much sawing to be done.

"*Q*. Was that after or before the teeth of the saw were set by Diehl?

"*A*. That was before."

It is perfectly evident from this testimony that what the plaintiff had in mind when he complained to the foreman, and what the foreman understood from the complaint (for that is exactly what it said), was not that the saw was out of order in the sense of increasing the personal danger to the person operating it, but that it was not in condition to do the work as rapidly and as efficiently as it should. The complaint was that the saw "needed setting," in order for it to do the proper amount of work in a proper manner. To a carpenter, "setting his saw" means with reference to the saw, practically the same thing as "sharpening his axe" means to a woodsman with reference to his axe. It not only is not extraordinary or unusual, nor a defective condition in the sense in which that term is customarily used, particularly with reference to danger of personal injury, but it is something of constant occurrence and is incidental to the use of the tool in its normal condition. It becomes necessary to "set" a saw just as it becomes necessary to "sharpen" an axe, and for the same reason, namely, because it becomes dull through use. All saws have to be "set" frequently if in use, just the same as all axes in use have to be frequently sharpened. The cutting efficiency of a saw results from the fact that its edge is shaped into teeth which, when drawn across the article to be sawed, cut a cleft out of that article the exact width of the thickness of the saw at its cutting edge. If the teeth of the saw remain in

the original plane of the remainder of the body or blade of the saw, the width of the cleft which the saw will cut is exactly the same as the thickness of the blade of the saw. When this is so, obviously, the entire blade in revolving or passing through the cleft made by the saw will rub against the sides of that cleft, causing friction, and preventing the saw from doing the work, which friction, of course, will increase as the cleft cuts further into the article. In order to avoid this situation, the teeth of the saw are "set"—that is, every alternate tooth is bent a very little out of the plane of the blade of the saw in one direction, and the other teeth are bent to the same extent in the opposite direction. This forms a wider cutting surface on the edge of the saw, and, consequently, a wider cleft is cut into the article being sawed, so that the body or blade of the saw will then not be as thick as the cleft is wide and will not touch its sides. The constant tendency, resulting from use of the saw, however, is to wear and bend the teeth back toward their original plane, and as a result, the first bending process, called "setting," must be repeated from time to time to overcome this tendency.

We think, therefore, from the clearly understood meaning of the language used in this complaint and promise, that it affirmatively appears that neither the servant nor the employer contemplated anything other than the effect upon the quality and quantity of the work to be produced, and that such a thing as a thought of any additional personal danger to the servant is expressly negatived by the substance of the complaint. It seems to us the same as if a man employed to chop wood had gone to his employer and said, "This axe is dull—I cannot do anything with it—it needs grinding," and the employer had said, "Well, whet it up on the whetstone the best you can and I will have it, ground Saturday afternoon." Certainly this complaint and this promise could not, by any possibility, be construed as having reference to anything but the efficiency of the axe in performing the work of cutting the wood.

Mr. Labott deduced from *Tesmer* v. *Boehm,* 58 *Ill. App.* 609, and *Chicago Bridge Co.* v. *Hayes,* 91 *Id.* 269, the proposition that "The general rule, as to the effect of the promise

(to repair, &c.), has no application to a case where neither the master nor the servant contemplated any additional danger to the servant in the use of the defective instrument, but only improvement in the work done with it." *Labott Mast. & Serv.*, § 422, *note* 8.    This principle was applied in *Balle* v. *Detroit Leather Co.*, 73 *Mich.* 158, and also in *International Railway Co.* v. *Turner*, 3 *Tex. Cir. App.* 487.    Mr. Justice Parker, in the opinion of the Supreme Court, in *Towler* v. *New Jersey Adamant Manufacturing Co.*, 50 *Vroom* 147, in distinguishing that case from the cases above mentioned, called attention to the fact that in all of those cases it affirmatively appeared from the notification itself that it was given in the interest of the work and not with reference to a condition of increased personal danger to the servant.

We think that in the present case a like purpose of the notification affirmatively appears from the notification itself and that the learned trial judge properly entered a nonsuit.

No consideration has been given to the question of whether or not the act of 1909, entitled "An act to extend and regulate the liability of employers for injury or death to employes in certain cases," might have any bearing, because it appears that the notice which, by the terms of the act, must be given in order to invoke its application, was not given in this case.

The judgment is affirmed.

Swayze, J. (dissenting).    My dissent is upon the ground that the case is within the provisions of section 3 of the act of 1909 (*Comp. Stat.*, *p.* 3043, *pl.* 91), and that the court was thereby required to submit the question to the jury.    I am authorized to say that Mr. Justices Trenchard, Minturn and Kalisch and Judge Bogert concur in this view.

*For affirmance*—The Chancellor, Chief Justice, Garrison, Bergen, Voorhees, Vredenburgh, Congdon, White, Treacy, JJ.    9.

*For reversal*—Swayze, Trenchard, Minturn, Kalisch, Bogert, JJ.    5.